IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF NEW MEXICO

LAWRENCE JOHNSON,

       Plaintiff,

vs.                                         No.  05cv0583 DJS

JO ANNE B. BARNHART,
COMMISSIONER OF SOCIAL SECURITY,

       Defendant.

## MEMORANDUM OPINION

**THIS MATTER** is before the Court on Plaintiff's (Johnson's) Motion to Reverse and Remand for Payment of Benefits, or, in the Alternative, to Remand for a Rehearing **[Doc. No. 11]**, filed October 21, 2005, and fully briefed on December 28, 2005.  On June 22, 2004, the Commissioner of Social Security issued a final decision denying Johnson's application for disability insurance benefits and supplemental security income benefits.  Johnson seeks judicial review of the Commissioner's final decision pursuant to 42 U.S.C. § 405(g).  Having considered the arguments, pleadings, administrative record, relevant law, and being otherwise fully informed, the Court finds that the motion to reverse or remand is not well taken and will be DENIED.

## I.  Factual and Procedural Background

Johnson, now sixty two years old (D.O.B. 12/17/1943), filed his application for disability insurance benefits on February 22, 2001.  On January 22, 2001, Johnson also filed a claim for supplemental security income.  Johnson alleges disability since January 1, 1998 (Tr. 73), due to asthma, hypertension, neck, shoulder and back pain, depression, post-traumatic stress disorder,

and anxiety.  Tr. 17.  Johnson has a bachelor's degree, five years of chiropractic college and relevant work as a chiropractor.  Tr. 17.  On June 22, 2004, the Commissioner's Administrative Law Judge (ALJ) denied benefits, finding that Johnson's impairments, while severe, did not meet or medically equal one of the impairments listed in Appendix 1, Subpart P, Regulations No. 4.  Tr. 18.  The ALJ further found Johnson retained the "residual functional capacity (RFC), despite his impairments, to perform light work activity."  Tr. 19.  After considering all of the evidence, the ALJ also found Johnson's allegations and subjective complaints "not fully credible."  Tr. 19.  Johnson filed a Request for Review of the decision by the Appeals Council.  On March 25, 2005, the Appeals Council denied Johnson's request for review of the ALJ's decision.  Tr. 4-6.  Hence, the decision of the ALJ became the final decision of the Commissioner for judicial review purposes.  Johnson seeks judicial review of the Commissioner's final decision pursuant to 42 U.S.C. § 405(g).

## II.  Standard of Review

The standard of review in this Social Security appeal is whether the Commissioner's final decision is supported by substantial evidence and whether she applied correct legal standards. *Hamilton v. Secretary of Health and Human Services,* 961 F.2d 1495, 1497-98 (10th Cir. 1992). Substantial evidence is more than a mere scintilla and is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion. *Glass v. Shalala*, 43 F.3d 1392, 1395 (10th Cir. 1994).  "Evidence is not substantial if it is overwhelmed by other evidence in the record or constitutes mere conclusion."  *Musgrave v. Sullivan*, 966 F.2d 1371, 1374 (10th Cir. 1992). Moreover, "all of the ALJ's required findings must be supported by substantial evidence," *Haddock v. Apfel,* 196 F.3d 1084, 1088 (10th Cir. 1999), and all of the relevant medical evidence

2

of record must be considered in making those findings, *see Barker v. Bowen*, 886 F.2d 289, 291
(10th Cir. 1989).  "[I]n addition to discussing the evidence supporting his decision, the ALJ must
discuss the uncontroverted evidence he chooses not to rely upon, as well as significantly probative
evidence he rejects." *Clifton v. Chater*, 79 F.3d 1007, 1010 (10th Cir. 1996).  Therefore, while
the Court does not reweigh the evidence or try the issues de novo, *see Sisco v. United States
Dep't of Health & Human Servs.*, 10 F.3d 739, 741 (10th Cir. 1993), the Court must
meticulously examine the record as a whole, including anything that may undercut or detract from
the ALJ's findings, in order to determine if the substantiality test has been met.  *See Washington
v. Shalala*, 37 F.3d 1437, 1439 (10th Cir. 1994).

### III.  Discussion

In order to qualify for disability insurance benefits or supplemental security income, a
claimant must establish a severe physical or mental impairment expected to result in death or last
for a continuous period of twelve months which prevents the claimant from engaging in
substantial gainful activity.  *Thompson v. Sullivan*, 987 F.2d 1482, 1486 (10th Cir. 1993)(citing
42 U.S.C. §423(d)(1)(A)).  The regulations of the Social Security Administration require the
Commissioner to evaluate five factors in a specific sequence in analyzing disability applications.
20 C.F.R. § 404.1520 (a-f).  The sequential evaluation process ends if, at any step, the
Commissioner finds the claimant is not disabled.  *Thompson v. Sullivan*,  987 F.2d at 1487.

At the first four levels of the sequential evaluation process, the claimant must show he is
not engaged in substantial gainful employment, he has an impairment or combination of
impairments severe enough to limit his ability to do basic work activities, and his impairment
meets or equals one of the presumptively disabling impairments listed in the regulations under 20

C.F.R. Part 404, Subpt. P, App. 1, or he is unable to perform work he had done in the past. 20

C.F.R. §§ 404.1520 and 416.920.  At the fifth step of the evaluation, the burden of proof shifts to

the Commissioner to show the claimant is able to perform other substantial gainful activity

considering his residual functional capacity, age, education, and prior work experience. *Id.*

      In support of his motion to reverse, Johnson makes the following arguments: (1)  the

vocational expert's (VE) testimony does not support a denial of benefits; (2) the ALJ's RFC

finding is not supported by the evidence; (3) the ALJ made erroneous findings regarding the

effects of his mental impairment; and (4) the ALJ's pain and credibility findings are contrary to the

evidence and the law.

## A.  Medical Records

      On September 3, 1999, Linda Terrell, D.C., performed a physical examination.  Tr. 116.

Johnson reported being a passenger in a truck that was involved in an accident on August 31,

1999.  Johnson complained that his right shoulder and the  right side of his head and neck were

hurting.  Johnson described the pain as constant and complained the pain interfered with his sleep.

Johnson was using ice and taking aspirin for the pain and reported some relief.  Johnson received

further chiropractic treatment from Dr. Terrell on September 4, 6, and 14.  Tr. 114.          On

September 21, 1999, Johnson returned to see Linda Terrell at BlueSky Chiropractic with

complaints of pain in his right shoulder.  Tr. 113.  Dr. Terrell noted a right shoulder click at the

A/C (acromioclavicular) joint at 50% elevation and "poor right shoulder tracking."  *Id.*  Dr.

Terrell made adjustments to certain segments.  Johnson reported feeling better "already."  *Id.*

Johnson received further chiropractic treatment on October 19, 20, 25, and November 8, 1999.

Tr. 114.  On November 8, 1999, Linda Terrell noted, "Is feeling pretty good."  Tr. 114.

On October 12, 1999, Johnson saw Bruce Hoffman, D.C., for right head, neck, shoulder, arm and left leg pain.  Tr. 189-194.  **On that day, Johnson competed an information form and indicated he had high blood pressure**.  Tr. 189.  Johnson also reported receiving treatment by another chiropractor (Linda Terrell) for the same condition.  Tr. 191.  Johnson returned for treatment on October 20, October 25, and November 8, 1999 and April 25, May 30, June 10 and June 29, 2001.  Tr. 188.

On April 4, 2000, Dr. David King submitted a "To Whom It May Concern" statement of disability.  Tr. 118.  Dr. King examined Johnson and opined as follows:

> Lawrence Johnson was examined by me on March 13, 2000 and in my professional opinion, as was indicated in the Certificate of Disability that I issued as a result of that examination, he is disabled at this time.

> History and examination confirm that he suffers from injuries received in an automobile accident of August 31, 1999 which produced a Hyperflexion/Hyperextension injury of the Cervical Spine and Lumbo-Sacral Strain/Sprain Syndrome.  He received contusions of the right Shoulder and Elbow.  He also suffered Contusions of the Right Supero-Frontal Scalp as a result of being thrown into the dash and windshield of the vehicle, in which he was a passenger.  These conditions are exacerbated by his **Chronic complaints of High Blood Pressure**, Asthma, Overweight and **Transient Depression**.

Tr. 118.

On **June 7, 2001**, Eugene Toner, M.D. performed a consultative examination.  Tr. 121-129.  Johnson reported he had been asthmatic all of his life, used bronchodilators about every 3-4 hours, had difficulty taking a deep breath, and had not sought medical care from MD's since he was in prison.  Johnson also reported having "**hypertension for the last 15 years**" and felt his hypertension was "responsible for his neck feeling stiff and his shoulders feeling stiff."  Tr. 121.  Johnson further reported that "**he does not see any MD . . ., since he has been out of prison**." Tr. 122.  **Johnson had also not taken prescription medication since leaving the prison**.

Dr. Toner performed a physical examination noting the following:

**OBJECTIVE**:  The claimant is moderately obese.  He is unshaven.  He is somewhat unpleasant.  He seems displeased at having to answer the questions during the interview portion of the examination.  He also has some difficulty in following some of the directions as far as the examination is concerned.

The claimant's gait is normal and abnormal pace.

Height 69 inches, weight 248 pounds, blood pressure 184/122, pulse 96, and respirations 16.

Visual acuity:  OD 20/100, OS 20/50, uncorrected.

Head is atraumatic.  Eyes are PERL.  There is no evidence of any AV (arteriovenous) nicking or hemorrhages to the fundi although there is some astigmatism in here and a clear view of the fundus was not possible.  His ears are ceruminous and nose is patent.  A throat [examination] showed teeth in poor dental hygiene  Thyroid is not enlarged.  Neck veins are flat and still from below.  Chest shows some scattered wheezes with some increase  in respiratory phase bilaterally.  Heart has a regular rhythm with no murmurs or gallops.  Abdomen is soft, nontender with no masses or organomegaly.  There is an aberration over his left knee.

Cervical range of motion rotation 30 right, 40 left, lateral flexion 20 right and left.  Forward flexion 35 and extension 25.  Thoracic range of motion is full.  Lumbar range of motion forward flexion 45.  He will not sit up with his legs extended.  Extension is 5, right and left lateral flexion 30.  <u>Straight-leg raising test is positive with 45, while supine negative while sitting.  I should also note that this claimant's right leg rotation was full when he was lying prone and has to look at my hand for hip range of motion.</u>  Shoulders were elevated at 120 extended 25 right 30/40 left and external rotate 20 right and 30 left with full abduction, adduction and internal rotation bilaterally.  Elbows have full range of motion with the exception of the right elbow only it supinates to 60 degrees.  Wrists have full range of motion.  Hands have 3/5 grip strength right through left, full pinch strength bilaterally.  He is unable to oppose his thumbs to his little fingers on either hand.  Hips will flex 90 extend 5 otherwise full range of motion is noted.  Knees and ankles have full range of motion.  There is no effusion to any joints.

Cranial nerves II-XII are intact.  The claimant has paresthesia is his right great toe.  He gives 3/5 shoulder girdle strength on the right, 4 on the left, and good quad and hamstrings bilaterally.  Deep tendon reflexes are trace positive in the upper and lower extremities.  There is no evidence of any deformities.  A slight atrophy to the left leg, right side 50 cm left 48, right calf 43 and left calf 41.

Two views of the cervical spine are obtained.  The bottom C6 was the lowest that could be visualized secondary to this claimants morphology, this shows that the disc spaces are well maintained.  There is some answer to the peaking of the inferior portion of C5.  There is no other abnormality noted.

Two views of the lumbar spine are obtained.  This shows some loss of the normal lordotic curve but disc spaces is well maintained.  There is no evidence of any other structural abnormality and no facet of arthritis.

**ASSESSMENT**:
1. Asthma, not under a medical treatment but treated with over-the-counter medications only.
2. Hypertension, not under medical care.
3. Complaints of neck and low back pain with no evidence of any radiculopathy.

**REMARKS**:
I feel that this claimant's complaints are in excessive of objective findings.  He obviously has high blood pressure and he does have some wheezing.  However, he is not receiving appropriate medical care and I do feel about (sic) [that] his symptoms would decrease with appropriate medical attention.  He has been told that his blood pressure was unacceptably high at today's visit and it was suggested that he seek medical care at the appropriate facility.  He wanted to know where he could go to get free medical care.  I did not have this information for him.

As for the claimant's neck and lower back complaints are concerned, I feel that there were some inconsistencies in his range of motion.  I have no information to indicate any pathology that would be responsible for this severe amount of cervical decreased range of motion or for his lumbar range of motion.  As a result of this examination as far as his orthopedics complaints are concerned I would not restrict his lifting, walking, standing, sitting or using his upper extremities.  I would state that he **may** have problems sustaining activity over an 8 hour period of time because of his hypertension and asthma.

Tr. 122-124(emphasis added).

Dr. Toner also submitted a Medical Source Statement of Disability to do Work-Related Activities.  Dr. Toner opined Johnson **was not limited** in his ability to lift, carry, stand, walk,  sit, hear, speak, or travel.  Tr. 128-129.  Additionally, Dr. Toner opined Johnson had **no limitations** in overhead reaching, in handling objects, and in fine manipulation with his hands/fingers.  Tr. 129.  On June 7, 2001, Johnson had a spirometry performed at Southwest Pulmonary Specialists.  Tr. 119-120.  Richard H. Seligman, M.D., noted, "Spirometry suggests a combined Obstructive/Restrictive defect of Moderate Degree improved by bronchodilator."  *Id.*  M. P. Finnegan, M.D., an agency nonexamining consultant, reviewed the spirometry results and opined

7

the results indicated Johnson's **"PFS's indicate vast improvement of FEV (forced expiratory volume), > 50% post Albuterol Therapy."**  Tr. 204.  Forced expiratory volume is the volume of air that can be forced out taking a deep breath, an important measure of pulmonary function.  *The Merck Manual* 556 (17th ed. 1999).  The forced expiratory volume in the first second is the FEV1.  *Id.*  Thus, Dr. Finnegan opined that Johnson's FEV improved by greater than 50% post Albuterol Therapy.  This is supported by the results reported.  The spirometry results indicate that pre bronchodilator Johnson had an FEV1 of 1.80 and post bronchodilator an FEV1 of 2.75, and a 53% change post bronchodilator.  Tr. 119.

On June 13, 2001, Joseph P. Cardillo, Ph.D., at the request of the agency, completed a consultative psychological evaluation.  Tr. 130-133.  Dr. Cardillo, a clinical psychologist, found as follows:

> **Summary and Recommendations:**  Larry Johnson has symptoms of Major Depression (DSM-IV: 296.3) and **mild to moderate** symptoms of Posttraumatic Stress Disorder (DSM-IV: 309.81).  He seems at least average in cognitive abilities.  He is able to remember basic instructions but has **mild deficits in memory**, perhaps related to depression and PTSD.  His depression and PTSD are related to his indictment, imprisonment, and health problems.  **By report**, he is experiencing significant asthmatic problems and dangerously high blood pressure for which he needs treatment.  He has a strong sense of hopelessness, though not immediately suicidal.  He has the potential for increased suicidal risk under stressful conditions.  Financial problems, not meeting family needs, loss of his professional practice, and ostracism are significant factors in his depression.  While he might be able to do part-time work if both his medical and mental state are treated, his ability to work is extremely limited at this time.  As a chiropractor, Dr. Johnson is reluctant to receive medical treatment.  Yet, he needs medication for his reported high blood pressure, medical assistance for his asthma, probably medication for his depression, and psychotherapy.  With medical and psychological assistance, he might be able to function in a part-time job with limited physical requirements.  He is able to manage his own benefit payments.

Tr. 133.  On June 20, 2001, Dr. Cardillo also completed a Psychiatric-Psychological Source Statement of Ability to do Work-Related Activities (Mental-MSS).  Tr. 134-136.  Dr. Cardillo opined Johnson was **not limited** in his ability to understand and remember instructions, both

detailed or complex instructions or very short and simple instructions.  Tr. 134.  In the area of

sustained concentration and task persistence, Dr. Cardillo opined Johnson was **mildly limited** in

his ability to carry out instructions and in his ability to attend and concentrate and **not limited** in

his ability to work without supervision.  Dr. Cardillo found Johnson **not limited** in his ability to

(1) interact with the public, (2) his ability to interact with coworkers, and (3)his ability to interact

with supervisors.  Dr. Cardillo also found Johnson **not limited** in his ability to be aware of normal

hazards and to react appropriately and in his ability to use public transportation or travel to

unfamiliar places.  Dr. Cardillo found Johnson **mildly limited** in his ability to adapt to changes in

the workplace and noted it depended on his asthma.  Finally, Dr. Cardillo found Johnson used

alcohol to sleep and cope with stress and depression and sleeping problems instead of appropriate

medications, but his use of alcohol was not severe.  Tr. 135.

On July 9, 2001, Leroy Gabaldon, Ph.D, a psychologist and agency nonexamining

consultant, completed a Psychiatric Review Technique Form.  Tr. 195-203.  Dr. Gabaldon found

Johnson suffered from Depressive syndrome characterized by sleep disturbance and feelings of

guilt or worthlessness.  Tr. 198.  Dr. Gabaldon also found Johnson suffered from anxiety as

evidenced by recurrent and intrusive recollections of a traumatic experience.  Tr. 200.

On July 9, 2001, M. P. Finnegan, M.D. reviewed the records and opined:

58 y.o. man who alleges
1. Back & neck pain– There is no medically determinable impairment, per CE, to account for
his complaints.  Physical exam at CE showed inconsistencies in his response and effort.
2. HTN– He refused to see MD's & is not taking meds.  Still, there is no evidence of target
organ damage.
3. Asthma– claims attacks several times a day yet her refuses to see a Dr.  Takes only
Primatene.  **PFS's indicate vast improvement of FEV, > 50% post Albuterol Therapy**.
Nonsevere.

Tr. 204 (emphasis added).

9

On **October 12, 2001**, four months after Dr. Toner advised Johnson to seek treatment for his hypertension, Johnson went to First Choice Community Healthcare for chronic back, neck, and shoulder pain, high blood pressure, depression, and asthma.  Tr. 214.  This was his first visit to First Choice.  The attending physician noted Johnson had received treatment for his hypertension when he was incarcerated but was now off medication.  Tr. 215.  The physician assessed Johnson with asthma and prescribed Albuterol MDI (metered-dose inhaler).  The physician also prescribed HCTZ (hydrochlorothiazide– diuretic and antihypertensive) for the hypertension.  Because Johnson complained of chest pain and shortness of breath, the physician referred him to a cardiologist.  The physician also ordered laboratory work.  *See* Tr.216-217.  The physician directed Johnson to return in one month for "further treatment."

On October 31, 2001, Johnson returned to First Choice for a follow-up.  Tr. 219.  At that time, Johnson complained of chronic low back pain with radiation to his right leg.  Johnson reported he had been in a motor vehicle accident two years prior to this visit but was evaluated by Dr. Torres at the time and his x-rays and EMG were normal.  Johnson reported he had been to a cardiologist and had a normal EKG with "additional evaluation pending."  *Id.*  Johnson also reported using Albuterol with partial relief.  The examination showed "fair to good BS (breath sounds), prolonged expiration phase.  The back examination showed "back tenderness over lower lumbar spine and no muscle spasms.  The physician assessed Johnson with hypertension not controlled and directed Johnson to continue with the HCTZ and added Zestril 40 mg to control the hypertension.  The physician directed Johnson to return in **one week** for a blood pressure check and to come in fasting for additional laboratory testing (lipid profile).  The physician also added Flovent 110 to better control his asthma.  The physician advised Johnson to continue taking

Ibuprofen for his chronic lower back pain and prescribed methocarbamol (skeletal muscle relaxant) as needed.  Johnson informed the physician he would be out of town for over one month and would reschedule the follow-up appointment.

On December 27, 2001, Johnson was evaluated at Valencia Counseling Services, Inc. by Ruth Walker, LISW (licensed independent social worker).  Tr. 225-234.  Johnson complained of depression.  Ms. Walker assessed Johnson as suffering from Major Depressive Disorder, recurrent, severe without psychotic features.  Tr. 227.

On January 2, 2002, Glenna Giles, a clinician with Valencia Counseling Services, Inc., evaluated Johnson.  Tr. 222.  Johnson reported feeling depressed but wanted "to wait to start on antidepressant" because he "will be out of the country for 3 mos." *Id.* Ms. Giles prescribed Trazodone 100 mg at bedtime for sleep and directed Johnson to return as needed.

On March 1, 2002, George Baca, M.D., performed a Psychiatric Evaluation/Comprehensive Assessment on Johnson.  Tr. 223-224.  Johnson reported having problems with depression and anxiety for the last 7-8 years.  Tr. 223.  Johnson reported having "a prior chiropractic practice but was convicted of fraud, and was in prison for several months." *Id.* Johnson reported that while in prison "he experienced a number of beatings, and witnessed a beating death." *Id.* "Since then he has not been able to work, and has become more depressed and socially avoidant." *Id.* Johnson had stopped taking the Trazodone because it did not help anymore.  Dr. Baca prescribed Zoloft 50 mg ½ for 4 days then 50 mg every day.  Dr. Baca assigned Johnson a GAF score of 40.[1]  A GAF score of 40 indicates the following: "Some

---

[1] Global Assessment of Functioning (GAF score) is a subjective determination which represents "the clinician's judgment of the individual's overall level of functioning."   American Psychiatric Assoc., Diagnostic and Statistical Manual of Mental Disorders 32 (Text Revision 4th ed.

impairment in reality testing or communication or major impairment in several areas, such as work or school, family relations, judgment, thinking, or mood (e.g. depressed man avoids friends, neglects family, and is unable to work.)."   DSM-IV-TR at 34.

    The Tenth Circuit has found that a GAF score, standing alone, without explanation, does not establish an impairment severely interfering with an ability to perform basic work activities. *See, e.g.*, *Eden v. Barnhart*, 109 Fed.Appx. 311, 314 (10th Cir. Sept. 15, 2004)("No one who rated Mr. Eden's GAF indicated that he could not work.  Because a score of **50** may not relate to Mr. Eden's ability to work, the score, standing alone, without further explanation, does not establish an impairment severely interfering with an ability to perform basic work activities."); *see also, Cainglit v. Barnhart*, 85 Fed.Appx. 71, 73 (10th Cir. Dec. 17, 2003)(finding ALJ properly found claimant's depression did not significantly limit her ability to work even though she twice received low GAF scores of **45** and **30** where the evidence indicated her depression did not impair her intellectual functioning, she had a good work history and she was able to live independently); *Branum v. Barnhart*, 105 Fed.Appx. 990, 994 (10th Cir. August 6, 2004)(finding ALJ properly found claimant did not suffer from a severe mental impairment (depression) where claimant had no limitations with respect to activities of daily living, slight impairment with respect to concentration, persistence, or pace, and no history of decompensation).

    On March 12, 2002, Johnson returned for a follow-up visit with Dr. Baca.  Tr. 220.  Dr. Baca noted Johnson had no major side effects or problems with Zoloft and "may have positive

---

2000) (DSM-IV-TR).  The GAF Scale ranges from 100 (superior functioning) to 1 (persistent danger of severely hurting self or others, persistent inability to maintain minimal personal hygiene, or serious suicidal act with clear expectation of death.).  DSM-IV-TR at 34.

changes beginning." *Id.*  Dr. Baca noted Johnson would continue Zoloft 50 mg and provided a refill because Johnson was "leaving out of the area next week." *Id.*

## B.  ALJ's Pain and Credibility Findings

The Court will first address Johnson's argument that the ALJ's pain and credibility findings are contrary to the evidence and the law.  Johnson contends the medical records support his complaints of pain and indicate he began complaining of shoulder pain beginning in 1999 when he sought "pain relief" from Dr. Terrell and later "mentioned the shoulder problems to Dr. Baca during a psychiatric session."  Mem. in Support of Mot. to Reverse at 16.

Credibility determinations are peculiarly the province of the finder of fact and will not be upset when supported by substantial evidence.  *Diaz v. Secretary of Health and Human Servs.*, 898 F.2d 774, 777 (10th Cir. 1990).  "Findings as to credibility should be closely and affirmatively linked to substantial evidence and not just a conclusion in the guise of findings."  *Huston v. Bowen,* 838 F.2d 1125, 1133 (10th Cir. 1988).  However, the ALJ's credibility determination does not require a formalistic factor-by-factor recitation of the evidence.  *Qualls v. Apfel*, 206 F.3d 1368, 1372 (10th Cir. 2000).  The ALJ need only set forth the specific evidence he relies on in evaluating claimant's credibility.  *Id.*  The ALJ may also consider his personal observations of the claimant in his overall evaluation of the claimant's credibility.  *Id.*

"A claimant's subjective allegation of pain is not sufficient in itself to establish disability." *Thompson v. Sullivan*, 987 F.2d at 1488.  In evaluating a claim of disabling pain, the ALJ must consider (1) whether there is objective medical evidence of a pain producing impairment, (2) whether there is a loose nexus between this objective evidence and the pain, and (3) whether, in light of the evidence, both objective and subjective, the pain is in fact disabling.  *Glass v. Shalala,*

43 F.3d at 1395 (citing *Luna v. Bowen*, 834 F.2d 161, 163 (10th Cir. 1987)).  When a claimant

complains of a pain-producing impairment, the ALJ is required to consider claimant's complaints

of pain by evaluating his use of pain medication, attempts (medical or nonmedical) to obtain relief,

the frequency of his medical contacts, and the nature of claimant's daily activities, as well as

subjective measures of credibility including the consistency or compatibility of nonmedical

testimony with the objective medical evidence.  *Kepler v. Chater*, 68 F.3d 387, 391 (10th Cir

1995).  The inability to work pain-free is not sufficient reason to find a claimant disabled.  *See*

*Gossett v. Bowen*, 862 F.2d 802, 807 (10th Cir. 1988).

     The ALJ found Johnson not "fully credible."  Specifically, the ALJ found that "to the

extent that the claimant alleges an inability to perform <u>any significant work activities</u> on a

sustained basis, <u>his allegations and subjective complaints are found not to be **fully credible**</u> <u>when</u>

<u>considered in light of the entirety of the evidence of record.</u>"  Tr. 19 (emphasis added).  In

support of this finding, the ALJ cited extensively to Dr. Toner's evaluation and noted Johnson

took no medication for pain but got chiropractic adjustments to decrease the pain. Tr. 18.  The

ALJ also noted that despite Johnson's complaints of "shortness of breath, wheezing, coughing,

<u>chronic pain</u>, fatigue, stiffness, anxiety, and depression," "the claimant's clinical examinations

have made few findings."  Tr. 19 (citing to Exhibits 1F (Linda Terrell's progress notes); 3F

(Spirometry done at Southwest Pulmonary Specialists); 4F (Dr. Toner's evaluation); 5F (Joseph

Cardillo, Ph.D.'s evaluation); 6F (Bruce Hoffman's treatment notes); 13F (**First Choice**

**treatment notes**); 14F (Valencia Counseling Services progress notes).

     The evidence supports the ALJ's finding that Johnson's pain was not disabling.  In his

Disability Report Adult, Johnson reported his "asthma, high blood pressure, neck, shoulder, and

back pain" were debilitating.  Tr. 82.  However, on the same report he listed several physicians

and noted he had not seen any of them since 1995.  Tr. 89.   Johnson did receive chiropractic

manipulations and traction from Linda Terrell and Bruce Hoffman.  However, as the ALJ noted,

neither chiropractor described the pain as disabling or prescribed pain medication.  In fact, Dr.

Terrell noted Johnson was feeling better as of September 21, 1999.  Moreover, in his May 3,

2001 Physical Daily Activities Questionnaire under "Name of Current Medication," Johnson did

not list any pain medication.  Tr. 99; *see also* Tr. 102 (no pain medication listed under "Type of

Treatment Received, including drugs).

    Significantly, Dr. Toner found Johnson's complaints in excess of objective findings.  Dr.

Toner ordered x-rays of the cervical and lumbar spine, both were unremarkable.  There also was

no evidence of radiculopathy.[2]   Tr. 124.  As far as Johnson's complaints regarding his **neck and**

**lower back**, Dr. Toner found inconsistencies in his range of motion and found "no pathology that

would be responsible for [Johnson's] severe amount of cervical decreased range of motion or for

his lumbar range of motion."  *Id.*  Notably, Dr. Toner found Johnson had a positive straight-leg

raising test while supine, yet it was negative while sitting.  Whether supine or sitting, the straight-

leg raising test is the same.  Dr. Toner also noted Johnson's "right leg rotation was full when he

was lying prone but ha[d] to look at [Dr. Toner's] hand for hip range of motion.  *Id.*  This

indicated to Dr. Toner that Johnson's performance during his evaluation of his range of motion

_____

    [2] Radiculopathy is defined as a disorder of the spinal nerve roots.  *Stedman's Medical
Dictionary* 1484 (26th ed. 1995).  Nerve root dysfunction causes a characteristic radicular
syndrome of pain and segmental neurologic deficit.  Physicians administer the straight leg raise
test to see if radicular symptomotology is reproduced.  Ventral (motor) root involvement causes
weakness and atrophy of a muscles innervated by the root.  Dorsal (sensory) root involvement
causes sensory impairment in a dermatomal distribution.  The corresponding segmental deep
tendon reflexes are depressed or absent.  *The Merck Manual* 450, 1488 (17th ed. 1999).

exam was suspect.  Consequently, Dr. Toner found **no limitations** in Johnson's ability to lift, carry, stand, walk, or sit.

The Commissioner contends Johnson was not candid during the October 20, 2003 Administrative Hearing before ALJ Connor.  Resp. at 8.  The ALJ questioned Johnson about his refusal to take medication for his hypertension and read from Dr. Toner's report.  Dr. Toner noted Johnson had hypertension but was not under medical care.  Johnson responded that he "wasn't taking high blood pressure medication because I didn't know I had high blood pressure **until** I went to [Dr. Toner] . . . ."  Tr. 278.  A review of the record belies Johnson's claim. Johnson reported to Dr. Toner that he suffered from hypertension "for the last 15 years" and felt "his hypertension [was] responsible for his neck feeling stiff and his shoulders feeling stiff."  Tr. 121.  Johnson also reported having hypertension to Bruce Hoffman on October 12, 1999.  On October 12, 2001, Johnson reported to the physician at First Choice that his hypertension had been treated while he was incarcerated.  Tr. 215.

Johnson also argues that the ALJ erred in relying on his "alleged failure to seek treatment to deny benefits to [him]."  Mem. in Support of Mot. to Reverse at 19.  However, the ALJ <u>did not</u> deny benefits for failure to seek treatment.  Johnson's refusal to seek treatment went to the ALJ's credibility determination.  Moreover, the ALJ did not find Johnson not credible.  As previously noted, the ALJ found Johnson "not to be fully credible."  Tr. 19.  The ALJ addressed Johnson's complaints of neck, shoulder and back pain.  The ALJ referred to Dr. Toner's evaluation and noted Johnson took "no medication for pain but gets chiropractic adjustments which decrease his pain."  *Id.*   The ALJ also reviewed the evidence and, as to Johnson's asthma, found no evidence indicating Johnson had asthma "in spite of prescribed treatment or that

16

required physician intervention."  Tr. 18.  The ALJ found that despite his complaints, Johnson's

"clinical examinations have made few findings" and noted that Johnson "refuses to seek medical

treatment for his impairments which suggests that his condition may not be as severe as he has

alleged."  Tr. 19 (emphasis added).  The ALJ then summarized the medical evidence that

supported her finding.  *Id.*

      The evidence supports the ALJ's credibility determination.  The evidence indicates

Johnson was aware that he had hypertension and asthma and had received treatment for these

conditions while in prison.  Tr. 215.  Johnson does not claim that these conditions were not

controlled with medication while he was incarcerated.  Yet he admitted to Dr. Toner that he had

"not sought medical care from MD's since he was in prison."  Tr. 121 ("He states that, he does

not seek medical care from MD's."); Tr. 122 ("The claimant states he does not see any M.D.  He

has not seen a physician, since he has been out of prison."); Tr. 133 ("As a chiropractor, Dr.

Johnson is reluctant to receive medical treatment.").  Additionally, at the September 11, 2002

Administrative Hearing before ALJ Morris, the ALJ stated, "You seemed very reluctant to want

to take any medicine in the past."  Tr. 255.  In response, Johnson stated, "Well, I'm a

chiropractor, and I guess I just, you know, it's hard to — ".  *Id.*  Thus, Johnson made clear that

he had not sought medical care from a medical doctor for over five years, since 1996 when he was

released from prison.  Tr. 17.  Johnson's reason for not seeking medical care from a medical

doctor was that, as a chiropractor, it was hard for him.  However, Johnson did not have a problem

seeking treatment from other chiropractors.  Nonetheless, hypertension and asthma are very

treatable conditions.

Based on the evidence, which is substantial, the ALJ properly relied on Johnson's failure to seek treatment for his hypertension and asthma as support for her determination that Johnson was not "fully credible" and his subjective complaints were not as severe as he alleged.

Johnson also contends the ALJ failed to adopt "Dr. Toner's ultimate conclusion that he would have difficulty sustaining an entire work-day." Mem. in Support of Mot. to Reverse at 19. Thus, Johnson argues the ALJ's "fail[ure] to consider that part of Dr. Toner's report casts further doubt upon her credibility determination." *Id.* The Court disagrees. Dr. Toner also concluded that, although Johnson "obviously has high blood pressure and he does have some wheezing," "he is not receiving appropriate medical care and I do feel about (sic) [that] his symptoms would decrease with appropriate medical attention." Tr. 124. Dr. Toner's supposition is borne out by the June 7, 2001 Spirometry. Tr. 119.

 "Because '[e]xaggerating symptoms or falsifying information for purposes of obtaining government benefits is not a matter taken lightly by this Court,' [courts] generally treat credibility determinations made by an ALJ as binding upon review." *Talley v. Sullivan*, 908 F.2d 585, 587 (10th Cir. 1990). Accordingly, based on the record as a whole the Court finds the ALJ's credibility determination is supported by substantial evidence and will not be disturbed.

**C.  RFC Determination**

Residual functional capacity is defined as "the maximum degree to which the individual retains the capacity for sustained performance of the physical-mental requirement of jobs."  20 C.F.R. Pt. 404, Subpt. P, App. 2, § 200.00(c).  In arriving at an RFC, agency rulings require an ALJ to provide a "narrative discussion describing how the evidence supports" his or her conclusion.  See SSR 96-8p, 1996 WL 374184, at *7.  The ALJ must "discuss the individual's ability to perform sustained work activities in an ordinary work setting on a regular and continuing basis . . . and describe the maximum amount of each work-related activity the individual can perform based on the evidence available in the case record."  *Id.*  The ALJ must also explain how "any material inconsistencies or ambiguities in the case record were considered and resolved."  *Id.*  "The RFC assessment must include a discussion of why reported symptom-related functional limitations and restrictions can or cannot reasonably be accepted as consistent with the medical or other evidence."  *Id.*

Johnson challenges the ALJ's RFC determination on the several grounds.  First, Johnson contends the ALJ's RFC determination is inconsistent with Dr. Toner's findings.  Specifically, Johnson contends the ALJ's RFC determination is contrary to Dr. Toner's statement that Johnson "**may** have problems sustaining activity over an 8 hour period of time **because of his hypertension and asthma**."  Johnson also maintains the ALJ adopted Dr. Toner's opinion "with respect to the credibility finding, with respect to Johnson's alleged failure to seek medical care, and with respect to the lack of restriction in the ability to lift, walk, stand, sit or use the upper extremities."  Mem. in Support of Mot. to Reverse at 9.  Thus, Johnson argues the ALJ "chose to rely on only those parts favorable to a finding of disability."  *Id.*  Johnson also contends the ALJ

"may not meet her burden at step five by stating that [his activities] do not preclude the performance of light work; she must point to positive evidence of such an ability." *Id.* at 10.

In determining Johnson's RFC the ALJ considered all the medical evidence, including Dr. Toner's report and Johnson's activities of daily living. Contrary to Johnson's claim, Dr. Toner did not find Johnson disabled. At the time of Dr. Toner's evaluation, Johnson was not being treated for his hypertension and asthma. Thus, based on this fact, Dr. Toner stated Johnson **may** have problems **because of his hypertension and asthma.** The ALJ's decision stated in relevant part:

> I am aware that the claimant has also alleged disability as a result of neck, shoulder and back pain. However, in a consultative examination performed on June 6, 2001, the examining physician found his complaints were in excess of objective evidence. In fact, there were also inconsistencies in his response and effort. His shoulders had full abduction, adduction and internal rotation bilaterally. The claimant's x-rays revealed some loss of the normal lordotic curve in the lumbar spine, but the disc spaces in the cervical and lumbar spine were well maintained. There was also no evidence of any other structural abnormality and no facet arthritis. <u>Dr. Toner concluded that there was no information to indicate any pathology that would be responsible for his severe amount of cervical decreased range of motion or for his lumbar range of motion.</u> <u>The claimant was not restricted in his ability to lift, walk, stand, sit or use his upper extremities</u> (Exhibit 4F). In addition, <u>he takes no medication for pain, but gets chiropractic adjustments which decrease his pain</u> (Exhibit 5F/3). As such, I find the claimant's neck, shoulder and back pain to be non-severe impairments.
>
> **\*\*  \*\*  \*\*  \*\*  \*\***
>
> After considering <u>all of the evidence of record</u>, I conclude that the claimant retains the residual functional capacity, despite his impairments, <u>to perform light work activity.</u> <u>He can walk one hour at a time, stand 15 to 20 minutes, sit several hours, and lift no more than 20 to 25 pounds. In addition, he cannot perform well in high stress areas, and would have to work in a fairly clean environment due to his respiratory condition.</u> In reaching this conclusion, I acknowledge the claimant has severe impairments that cause significant limitations of his ability to perform basic work activities. Indeed, <u>the assessment of the claimant's residual functional capacity allows for many of his subjective complaints and limitations.</u> <u>As discussed more fully below</u>, however, to the extent that the claimant alleges an inability to perform any significant work activities on a sustained basis, his allegations and subjective complaints are found not to be fully credible when considered in light of the entirety of the evidence of record.

The medical records reflect that the claimant has a longstanding medical history including complaints of shortness of breath, wheezing, coughing, chronic pain, fatigue, stiffness, anxiety, and depression. <u>Despite his complaints, the claimant's clinical examinations have made few findings</u> (Exhibits 1F (Linda Terrell's progress notes); 3F (Spirometry done at Southwest Pulmonary Specialists); 4F (Dr. Toner's evaluation); 5F (Joseph Cardillo, Ph.D.'s evaluation); 6F (Bruce Hoffman's treatment notes); 13F (First Choice treatment notes); 14F (Valencia Counseling Services progress notes). <u>I also note that the claimant refuses to seek medical treatment for his impairments, which suggests that his condition may not be as severe as he has alleged.</u> <u>While the claimant maintains that he experiences asthma attacks several times a day, he has required no emergency room visits, hospitalizations or intubation.</u> He uses no supplemental oxygen, has no nebulizer, and takes only over-the-counter Primatene (Exhibit 4F). On June 6, 2001, the claimant reported that he had not seen a physician or had any refills of prescribed medication since his release from prison (Exhibit 4F/2). At that time, the claimant also had a blood pressure reading of 184/122, which was unacceptably high. The examining physician suggested he seek medical treatment at the appropriate facility, however, the claimant failed to do so (Exhibit 4F). Pulmonary Function Studies performed on June 7, 2001, revealed a combined obstructive/restrictive defect of a moderate degree improved by bronchodilator (Exhibit 3F). Progress notes dated October 12, 2002 document that claimant had received treatment for his hypertension while incarcerated but was currently off medications (Exhibit 13F/3).

A consultative psychological evaluation performed on June 13, 2001 by Dr. Joseph P. Cardillo reveals that claimant had short-term memory problems and depression but no evidence of anxiety or a thought disorder. The examining psychologist concluded that claimant had symptoms of major depression and mild to moderate symptoms of post-traumatic stress disorder. He was unable to remember basic instructions but had mild deficits in memory. He had a strong sense of hopelessness, though not immediately suicidal. Dr. Cardillo noted that claimant also had the potential for increased suicidal risk under stressful conditions (Exhibit 5F).

<u>A mental health record dated January 2, 2002 from Valencia Counseling Services discloses that claimant did not want to start on anti-depressants because he was going out of the country for three months</u> (Exhibit 14F/3). A psychiatric evaluation performed on March 1, 2002 by Dr. George Baca reveals that claimant had persisting depression with vegetative symptoms as well as persisting anxiety and social avoidance consistent with post-traumatic stress disorder. It was noted that he had no prior mental health treatment and no prior medication trials. The claimant was given a trial of Zoloft. Diagnostic impression was major depression, recurrent, severe; and post-traumatic stress disorder (Exhibit 14F/5). <u>On March 12, 2002, the claimant reported no major side effects from Zoloft and indicated some positive changes with medication (Exhibit 14F/1).</u>

While the medical records reveal that the claimant has hypertension, asthma, and psychiatric impairments, <u>he is not receiving the appropriate medical care for his condition. In fact, the examining physician and psychologist both concluded that his symptoms would decrease with appropriate medical attention</u> (Exhibits 4F/4; 5F/4). The claimant only received medical care while he was incarcerated but has refused to see a medical doctor since his release from prison. Despite his elevated blood pressure, he takes no medication for hypertension, takes

only over-the-counter medication for asthma, and has not attended any counseling or therapy but takes medication for his mental condition (Exhibits 4F; 5F; 13F/3; testimony).  Although Dr. David King reported on April 4, 2000, that the claimant was disabled as a result of his injuries sustained in a motor vehicle accident on August 13, 1999, I find Dr. King's opinion to be conclusory and not supported by the objective medical evidence (Exhibit 2F).  **Furthermore, the record was left open for the submission of updated medical records. However, no records were received.  Moreover, the claimant notified our office that he would not be available for a supplemental hearing.  In summary, there is very little evidence to support the claimant's allegations**.

Despite symptoms of pain, shortness of breath, wheezing, fatigue, and stiffness, the claimant reported on June 7, 2001, that he spends his day using his computer, does some paper work, shops, goes to the post office, watches television, and infrequently runs state seminars (Exhibit 4F/2).  I also note that he is able to take care of his personal needs, collects coins and stamps as a hobby, goes to the movies, talks on the telephone, goes golfing twice a year, does some yard work, and travels to Mexico where he lives two to three months a year (Exhibit 3E; testimony).  I do not find the claimant's description of daily activities inconsistent with the residual functional capacity I have assessed

Accordingly, I find the claimant retains a residual functional capacity which supports sustained work activity on a regular basis at the light level of exertion.  This determination is consistent with the opinions of the State Agency medical consultants who have also found the claimant is not disabled (Exhibits 7F; 9F).  As the opinion of non-treating physicians, their opinions are not entitled to controlling weight, but must be considered and weighed as those of highly qualified physicians who are experts in the evaluation of the medical issues in disability claims under the Social Security Act (SSR 96-6p).

Tr. 18-20 (emphasis added).  Thus, in determining Johnson's RFC, the ALJ considered all the evidence, including Dr. Toner's report, Johnson's activities of daily living, and Johnson's testimony.  The ALJ determined that Johnson retained the RFC to perform light work activity because he could walk one hour at a time, stand 15 to 20 minutes, sit several hours, and lift no more than 20 to 25 pounds.  Tr. 19.  These findings are supported by Johnson's testimony.  Johnson testified that he could walk for an hour at a time (Tr. 288), stand for at least 15 to 20 minutes (Tr. 289), and sit for "maybe hours" (Tr. 289), and lift "maybe 20, 25 pounds" (Tr. 289).

Moreover, as previously noted, Dr. Toner also concluded that, although Johnson "obviously has high blood pressure and he does have some wheezing," "he is not receiving

appropriate medical care and I do feel about (sic) [that] his symptoms would decrease with appropriate medical attention."  Tr. 124.  Dr. Toner's supposition is supported by the evidence. The June 7, 2001 Spirometry shows that  Johnson's "PFS's (Pulmonary Function Spirometry) indicate vast improvement of FEV (forced expiratory volume) by > (greater than) 50% post Albuterol therapy."  Tr. 204 (emphasis added).  Thus, Johnson's asthma improved with just one dose of Albuterol.  Johnson also reported his blood pressure "was better" had "come down" by "10 or 15" points when he last saw Dr. Yamamoto, his treating physician at First Choice.  Tr. 281, 281.  This decrease in his blood pressure was due to HCTZ.  Tr. 281.  There is no record of how Johnson's hypertension responded to the second antihypertensive medication prescribed on October 31, 2001. Tr. 219.

However, at the **October 20, 2003 Administrative Hearing**, the ALJ asked Johnson if there was "any follow up with any of the physicians or anybody else after **August of 2002**."  Tr. 267.  Johnson responded he had follow-up care "about every two months."  Tr. 267.  Johnson informed the ALJ he had given his counsel a list of "the dates of the renewals (prescription refills) which show what dates that I went in."  *Id.*  The ALJ admitted the document into evidence. Johnson testified that he went to two different places, First Choice and Glenna Giles at Valencia Counseling Services.  Tr. 269.  Johnson further testified that his treating physician at First Choice had not ordered any new treatment and was "just prescribing" his medications.  The document Johnson submitted has an "Appt Date & Dr." category.  Tr. 186.  Under that category, Johnson indicated he had seen his physician at First Choice on 10/12/01 (Dr. Ghuneim), 10/30/01 (Dr. Yamamoto), 9/13/02 (Dr. Yamamoto), and **10/4/02** (Dr. Yamamoto).  Thus, Johnson's own records indicate that his last visit to Dr. Yamamoto was on October 4, 2002, more than a  year

prior to the **October 23, 2003** Administrative Hearing.  Johnson's records also indicate that he

saw his physician twice in 2001 and twice in 2002.  Johnson also documented that his last visit to

Dr. Baca or Valencia Counseling Services was on **March 12, 2002**.  Tr. 186.  Johnson had been

receiving his prescription for Zoloft from Dr. Yamamoto since March 3, 2002.  *Id.*

Under the category "Date Refilled," Johnson documented refilling his medications as

follows:

1.  hydrochlorothiazide (HCTZ) –  10/17/01 (1st Filling), 1/15/02 (Refill), 10/4/02,

2/25/03 (Refill- can refill 9 x's by 2/24/04), 5/25/03

2.  Zestril –  10/31/01 (1st Filling), 12/30/01 (Refill), 2/1/02 (Refilled in Mexico), 9/13/02

(1st filling of Lisinoril (same as Zestril)), 2/25/03 (Refill- can refill 2x's by 2/24/04,

6/19/03, 5/25/03

3.  Albuterol–  10/17/01 (1st Filling- can refill 2x's by 2/24/04), and 5/25/03

4.  Flovent–  10/31/01 (1st Filling), 12/30/01 (Refill- can refill 2x's by 2/24/04, 525/03,

and 6/19/03.

5.  Zoloft–  3/03/02 (1st Filling), 3/12/02 (George Baca/Val Counseling), 3/15/02 Refilled

in Mexico, 10/4/02 (1st Filling Yamamoto 1st Choice), 2/25/03 can refill 2x's by 2/24/04,

and 5/25/03

Tr. 186.  Thus, Johnson's records indicate that he continues to take the same medications for his

hypertension and asthma.  The frequency of his visits to his physicians also indicates his

hypertension and asthma are not as severe as Johnson alleges.  Notably, Johnson testified that his

asthma and hypertension were not his "main problem."  Tr. 282.  Johnson testified as follows:

A:      Well, you know, it seems like everybody really misses the main problem and that's the

depression that I have and the real problem of listlessness and you know, some the spacey

times that I have thinking about some of the things that have happened to me.  You know,

the post-traumatic stress disorder which, you know, I thought it was kind of corny when

they started talking about it but I've done a little reading on it now and it's true.  I really

do kind of have these lapses and <u>I think that's the single thing that's really–  that worries</u>

<u>me the most.  And — you know.  These fellows don't even use that as the primary</u>

<u>problem which I think that's the primary problem</u>.

Tr. 282-283 (emphasis added).

The Court also notes, as did the ALJ, that Johnson had the opportunity to submit updated

medical records after the administrative hearing and failed to do so.  Tr. 20, Tr. 268-273 (The

ALJ directed Johnson "to update, if your attorney would update the records from Glenna Giles– I

want any and all office notes, anything that could let me know how he's doing and that going on

with their treatment).  The Administrative Hearing was held on October 20, 2003, and the ALJ's

decision was issued on June 22, 2004, ample time to submit updated medical records.  The ALJ

also offered Johnson the opportunity for a supplemental hearing.  Tr. 311.  Johnson later notified

the agency that he would not be available for a supplemental hearing. Tr. 20.  Based on all the

evidence the Court finds that the ALJ's RFC determination is supported by substantial evidence.

**D.  Mental Impairment**

Johnson contends the ALJ's findings regarding the effects of his mental impairment is

erroneous.  Mem. in Support of Mot. to Reverse at 10.  Johnson alleges he "has suffered

depression and post-traumatic stress syndrome as a result of his conviction and subsequent

incarceration." *Id.*  Johnson claims he witnessed a prisoner being beaten to death by other

prisoners and was in turn beaten as a warning not to report the incident.  According to Johnson,

the memories of the beatings affect him by "immobilizing him" for weeks.  During these periods

of "immobilization," he "finds it difficult to motivate himself.  *Id.*  Additionally, Johnson contends

he cannot "endure stress, or confrontation of any kind."  *Id.*

On June 20, 2001, Joseph P. Cardillo, Ph.D., submitted a Psychiatric-Psychological

Source Statement of Ability to do Work Related Activities (Mental-MSS).  Dr. Cardillo opined

Johnson was **not limited** in his ability to understand and remember instructions, both detailed or

complex instructions or very short and simple instructions.  Tr. 134.  In the area of sustained

concentration and task persistence, Dr. Cardillo opined Johnson was **mildly limited** in his ability

to carry out instructions and in his ability to attend and concentrate and **not limited** in his ability

to work without supervision.  Dr. Cardillo found Johnson **not limited** in his ability to (1) interact

with the public, (2) his ability to interact with coworkers, and (3) his ability to interact with

supervisors.  Dr. Cardillo also found Johnson **not limited** in his ability to be aware of normal

hazards and to react appropriately and in his ability to use public transportation or travel to

unfamiliar places.  Dr. Cardillo found Johnson **mildly limited** in his ability to adapt to changes in

the workplace and noted it depended on his asthma.

Johnson asserts that Dr. Cardillo rated him "as moderately limited in the categories of

carrying out instructions, and adapting to changes in the workplace."  Mem. in Support of Mot.

to Reverse at 11.  However, Dr. Cardillo's evaluation does not support Johnson's assertion.  Dr.

Cardillo clearly noted that, in the area of sustained concentration and task persistence, Johnson's

ability to carry out instructions was "moderately limited" if physical due to asthma.  Tr. 134-135.

Dr. Cardillo also clearly noted that, in the area of adaptation, Johnson's ability to adapt to changes in the workplace would be "moderately limited" but depended on "how physical changes would be" due to asthma.  Tr. 135.  Otherwise, both these categories would be only "**mildly limited**."  Tr. 134, 135.

Johnson also asserts that Dr. Cardillo opined that "While he might be able to do part-time work if both his medical and mental state are treated, his ability to work is extremely limited at this time."  Mem. in Support of Mot. to Reverse at 11.  However, Dr. Cardillo qualified this statement.  Dr. Cardillo also noted, "**By report**, he is experiencing significant asthmatic problems and dangerously high blood pressure for which he needs treatment."  Tr. 133.  Dr. Cardillo further noted, "[b]ecause Mr. Johnson is winded easily, his daily activities are limited."  Tr. 132.  Thus, Dr. Cardillo's evaluation, read in its entirety, does not support a finding of disability.

Johnson also argues that his evaluation by Dr. Baca supports a finding of disability. Johnson claims he meets Listing 12.04 (Affective Disorders) based on Dr. Baca's March 1, 2002 evaluation.  According to Johnson he meets the requirements in ¶A because he "has the symptoms in more than four of these areas: appetite disturbance, sleep disturbance, feelings of guilt or worthlessness, decreased energy, suicidal thoughts, and hallucinations, delusions or paranoid thinking."  Mem. in Support of Mot. to Reverse at 13.  Johnson also claims he meets ¶B criteria. Johnson claims he has "**marked difficulty** in maintaining social functioning and **marked difficulty** in maintaining concentration, persistence and pace."  *Id.*  In support of this claim, Johnson cites to pages 130 and 134 of the transcript alleging he has short-term memory problems that affect his ability to carry out instructions.  However, page 134 indicates the opposite.  Dr.

Cardillo noted that Johnson was "**mildly limited**" in his ability to carry out instructions and

"**moderately limited**" <u>only</u> "if **physical** then limited" due to asthma.  Tr. 134, 135.

Johnson also cites to page 132 of the transcript in support of his contention that he has

marked difficulty in maintaining social functioning.  Again, the record does not support Johnson's

contention.  Page 132 is part of Dr. Cardillo's evaluation.  As previously noted, Dr. Cardillo

found Johnson was "**not limited**" in social interactions, including his ability to interact with the

public, his ability to interact with coworkers, and his ability to interact with supervisors.  Tr. 135.

Johnson cites to Dr. Baca's evaluation, page 223 of the transcript, and contends it supports a

finding that he has problems with concentration, problems with relationships, social anxiety and

social avoidance.  All these "symptoms" are listed under "History" and were reported by Johnson.

Tr. 223 ("He describes persisting depressed mood, crying spells, low self image, etc., and

vegetative changes, including changes in sleep and weight, problems with concentration, energy

level, motivation and increased irritability.  He also reports having recurrent nightmares related to

specific traumatic events, flashbacks, problems with relationships, social anxiety and social

avoidance.").  However, Dr. Baca performed a mental status examination and noted the

following: General Appearance/casual and neat; Orient in all three spheres; normal speech and

normal range (i.e., not tangential, not circular, not disorganized, not illogical, not blocked, no

flight of ideas); Content was appropriate (i.e., no delusions, no hallucinations, no phobias, no

OCD symptoms); Memory problems only with short term memory; Mood/Affect- depressed,

anxious, worry; Attitude/cooperative; Insight/Judgment- adequate; and Impulse control-

adequate.  Dr. Baca noted Johnson's Treatment Needs as (1) Ongoing Therapy and (2)

Medication Trial/Management.  Nowhere in Dr. Baca's evaluation did Dr. Baca find Johnson had

"marked difficulties in maintaining concentration, persistence, or pace" or "marked difficulties in maintaining social functioning."

Additionally, although Johnson reported "problems of depression and anxiety" for "about the last 7-8 years," nonetheless the ALJ noted he did not seek counseling even when it was recommended.  Tr. 223, 2270-272 .  On December 27, 2001, Ruth Walker assessed Johnson with Major Depression and recommended medical management and **therapy**.  Johnson also testified that he had read Dr. Cardillo's report in which Dr. Cardillo opined Johnson needed medication for his depression and **psychotherapy**.  Tr. 284.  Dr. Baca also ordered medication and "**ongoing therapy**."  Tr. 224.  Nonetheless, at the October 20, 2003 Administrative Hearing, Johnson testified he had not been "in any kind of therapy, psychotherapy, or counseling of any kind."  Tr. 270.  He also testified he had not seen Glenna Giles for over a year.  He testified Dr. Yamamoto prescribed his Zoloft,  "so for the past year-and-a-half, [he] hadn't been involved in any way with a psychiatrist or a psychologist."  Tr. 272.  Contrary to the evidence and his testimony, he explained his reason for not seeking psychotherapy was that "Nobody's suggested it."  *See* Tr. 283-284.

Additionally, on January 2, 2002, Johnson declined an antidepressant and "wanted to wait to start on antidepressant" because he was going to "be out of the country for 3 mos."  Tr. 222.  Johnson testified and the evidence supports that Johnson spent long periods of time, up to three months, in Belize or Mexico every year.  *See e.g.* Tr. 273.  The ALJ considered this fact, noting in her decision: "A mental health record dated January 2, 2002 from Valencia Counseling Services discloses that claimant did not want to start on anti-depressants because he was going to be out of the country for three months (Exhibits 14F/3)."  Tr. 20.  Foregoing treatment for his depression

for three months indicates that Johnson did not perceive his depression was as severe as he alleged.  Johnson's "failure to avail [himself] of available therapeutic treatment is a legitimate factor to be considered in evaluating the severity of [his] alleged mental limitations."  *Foy v. Barnhart*, 139 Fed.Appx. 39, 43 (10th Cir. June 29, 2005)(claimant did not follow up with therapy offered, choosing instead to treat mental condition with only with psychotropic medications).  In this case, Johnson failed to avail himself of an antidepressant for three months so he could travel to Mexico and failed to avail himself of psychotherapy even though recommended by Dr. Cardillo, Dr. Baca and Ms. Walker.  Three months later, on March 1, 2002, Dr. Baca prescribed a trial of Zoloft.  Tr. 221.  Less than two weeks later, on March 12, 2002, Johnson reported to Dr. Baca that he was having "some positive changes beginning"  with his "rx trial" of Zoloft and had "no major side effects or problems."  Tr. 22.  Accordingly, the Court finds that the ALJ's factual finding regarding the severity of claimant's depression is supported by substantial evidence.

## E.  Vocational Expert Testimony

The ALJ found that Johnson was unable to perform his past relevant work  However, at step five of the sequential evaluation process, the ALJ determined that Johnson retained the RFC to perform <u>light</u> work activity but due to his exertional and non-exertional limitations (can walk one hour at a time, stand 15 to 20 minutes, sit several hours, and lift no more than 20 to 25 pounds; he cannot perform well in high stress areas, and would have to work in a fairly clean environment due to his respiratory condition) he was not capable of performing all or substantially all of the requirements of light work.  Tr. 19, 21.  Therefore, the ALJ enlisted a VE and

determined there was a significant number of jobs in the national economy that Johnson could perform given his RFC and other vocational factors.  Tr. 22.

The VE testified that assuming the hypothetical individual's specific work restrictions, Johnson was capable of making a vocational adjustment to other work and that there was a significant number of other jobs existing in the national economy.  Tr. 299.  The VE testified that given all these factors Johnson could perform the occupations of Research Assistant II, Teachers Aide I, and Information Clerk. The VE's testified as follows:

Q:     Okay.  Ms. Beard, we sent you the various vocationally relevant documents concerning Mr. Johnson.  Did you have the opportunity to review those?

A:     Yes, I did.

Q:     And can you characterize what his past employment has been?

A:     Yes. **A chiropractor is medium and SVP eight, skilled**.

Q:     Okay.  And that's the only SGA he's done in the past 15 years?

A:     Yes, that's all I saw in the record.

Q:     Okay.  Would an individual who's the same age with the same education and work experience as Mr. Johnson have acquired any transferable skills?

A:     Yes.

Q:     And what would those be?

A:     Transferable skills such as assisting patient's, diagnosing, determining, performing diagnostic procedures, keeping records, preparing reports, reviewing records, obtaining information, providing information, basic general office skills.

31

Q:     Okay.  I'm going to give you a hypothetical.  I want you to assume an individual who is the same age, the same education, the same work history as Mr. Johnson, and the same transferable skills that you just mentioned and factor in these following exertional limitations.  This individual is limited to walking for one hour.  Standing for no more than 15 to 20 minutes at a time.  He can sit fairly comfortably for several hours.  He's limited to lifting no more than 20 to 25 pounds occasionally.  He would not perform well in a high stress environment that would for example require constant supervision and quotas and this type of thing.  He would also have to work in a fairly clean environment, no smoke, no chemicals, no other pollutants or substances in the air that would affect his asthma. Are there any jobs that exist in significant numbers in the national economy that such a person could do?

A:     Yes.  With that hypothetical, jobs such as research assistant.  That's DOT number 199.267-034, SVP six, sedentary, 900 in the region, 500 nationally.  Also there's two types of teacher aide.  This is a teacher aide skill level.  It's DOT number 099.327.010, SVP six, light 9,000 in the regional, 500,000 nationally.  Information clerk, DOT 237.367-022, SVP four, sedentary, 3,200 in the region, 300,000 nationally.  Those are three examples.

ALJ:   Okay.  Thank you very much. Counsel, did you have any questions you'd like to ask?

Atty:  Thank you.

Q:     You said that based on the hypothetical that was given you by the Administrative Judge that you believe Mr. Johnson to be a research assistant?

A:      That's correct.

32

Q:      And what type of research would that be?

A:      It would be working for an attorney for example doing medical research, going to the library researching topics.  It could be a position such as that.

**  **  **  **  **  **

ALJ:    Well, I understood her testimony that first of all he had acquired transferable skills not only from his education but in using that education as a chiropractor and what all of that means including running an office, including dealing with patients, making assessments, and providing treatment.  But you broke it down more specifically than I just did.  So while it is relevant that he has that level of education and skill work experience, you have to combine that with what transferable skills he acquired over those years.  All right?

Atty:   All right.

ALJ:    So it becomes less and less important in terms of how remote was his education.  I'm sure you're just as bright a lawyer today as you were 20 years ago and when you went to law school.

Atty:   More so.

ALJ:    Okay, so I rest my case with that question.

Atty:   We'll rest your case on that.

ALJ:    Unless you've done something, real, real specific that you want– that there's underlying objective medical evidence to support your modifying the hypothetical.

**  **  **  **  **  **  **

Atty:   And I think there was a third category that you mentioned.

VE:     Yes, the teacher aide position.

33

Atty:   Teacher's aide?

VE:     Teacher aide.

Atty:   Now explain to me, what are the tasks that a teacher's aide would be doing that you feel

        that Dr. Johnson could do.

VE:     Providing education.  He's provided, he's educated patients.  He's provided information.

ALJ:    <u>Well, didn't he testify also that he was hired by a chiropractic association to perform</u>

        <u>seminars and other functions like that</u>?

Atty:   I think that he did testify that on a few occasions he's done that.  But I think when we get

        his tax records, we're going to see if those occasions were sufficient that they would

        provide a living.  I think that we would also–

ALJ:    Well, it would only be evidence of his ability to do it.  You know, it wouldn't be that one

        thing in and of itself.

Atty:   Well, now how would and I've forgotten now whether you were– whether this is within

        your ability to give an opinion.  How would his mental health, and his emotional health

        play into being a teacher's aide?

VE:     Could you give me specific information.

Atty:   Well, would he have to appear every day for work?

VE:     Well, as we discussed, the employers do allow for some time for sick leave.  And as I said,

        it's on the average of one to two days a month.

ALJ:    Counsel, I don't want to cut you short but we're running way over here and I've got other

        hearings but let me make this offer to you.  You prepared a very nice summary for me

        which I appreciate and if you would like, if you feel that you want to take more time in

                                              34

order to take a position on what the vocational expert's testimony is.  I would be happy to give you time to write up a little addendum to this.

Atty:   That's quite wonderful, thank you.

** ** ** ** ** ** **

Atty:   Well, I must have missed that in some manner.  Would we be able for example to bring one of – bring Dr. Baca or a psychiatrist in?

ALJ:    They won't come.

Atty:   They won't?

ALJ:    Unless you want to pay them, you know, a hefty–

Atty:   Well that may be a worthwhile endeavor to have a psychologist to testify to the affect of the depression on his ability to perform these tasks that would be necessary to all these jobs that are available in the national economy.

ALJ:    If you want to consider that after discussing it at more length with your client, just contact me by mail.

Atty:   All right.

ALJ:    And ask for a supplemental hearing and advise me who you want to bring.  Who you would– check and make sure you can get a doctor and then I'll try to accommodate him in scheduling a supplemental hearing.

Atty:   Thank you.

Tr. 298-311 (emphasis added).

Johnson contends the ALJ relied on insufficient evidence from the vocational expert (VE) to deny benefits.  Specifically, Johnson challenges the ALJ's step five finding on the grounds that

(1) the phrase "basic general office skills" is insufficiently specific, (2) there was no evidence in the record that he acquired the skills, and (3) the ALJ did not explain how the skills transferred to the identified occupations.

As of his date last insured, Johnson was fifty-eight years old, had a bachelor's degree and five years of chiropractic college, and had worked as a chiropractor.  At the time of the Administrative Hearing, Johnson was 61 years of age and thus the ALJ applied the regulation governing transferability of skills for "an individual closely approaching retirement age."  Tr. 21.  Had the ALJ used Johnson's age on the date he was last insured, the applicable regulation would have been for a person of "advanced age."  The Court notes that in *Jensen v. Barnhart*, 436 F.3d 1163, 1164 (10th Cir. 2006), in applying the regulations governing transferability of skills, the Tenth Circuit used the claimant's age at the time of the "date he was last insured" rather than the claimant's age at the time of the Administrative Hearing or the ALJ's decision.  In this case, it does not make a difference because under either regulation, the Court finds, as fully discussed below, that the Commissioner met her burden at step five of the sequential evaluation process of proving that there are sufficient jobs in the national economy for a hypothetical person with Johnson's impairments.

Under the regulations, at age 61, Johnson was considered  a person "closely approaching retirement age."  20 C.F.R. §404.1568(d)(4).  "In determining whether an individual has any transferable skills, the focus is on the individual's past relevant work."  *Prince v. Apfel*, 1998 WL 317525 (10th Cir. 1998)(citing to 20 C.F.R. §404.1568(d)(1)).  Moreover, Social Security Ruling 82-41, *Work Skills and Their Transferability*, states, in pertinent part: "People with highly skilled

work backgrounds have a much greater potential for transferability of their skills because potential

jobs in which they can use their skills encompass occupations at the same or lower skill levels,

through semiskilled occupations.  Usually, the higher the skill level, the more the potential for

transferring skills increases."  SSR 82-41, 1982 WL 31389 *4 (1982).  Significantly, the Social

Security Administration distinguishes between job skills "unique to a specific work process in a

particular industry or work setting" and job skills "with universal applicability across industry

lines."  *Id.* at *5.  Where "job skills have universal applicability across industry lines, e.g., clerical,

**professional**, administrative, or managerial types of jobs, transferability of skills to industries

differing from past work experience can usually be accomplished with very little, if any, vocational

adjustment where jobs with similar skills can be identified as being within an individual's RFC."

*Id.* (emphasis added).

Johnson contends "basic general office skills" is not specific enough to define the skill to

which the ALJ and the VE referred.  The Court disagrees.  As that term is commonly used, it

refers to knowledge in the use of office equipment (i.e. telephones, copy machines, computers,

staplers, etc.), filing, and communicating effectively (i.e., responding to telephone inquiries,

answering questions whether by coworkers or visitors, taking messages, greeting visitors,

writing).  In his disability report, under Information About Your Work, Johnson stated he was

self-employed and indicated he supervised other people, completed reports, and used office

equipment.  Johnson also testified he presented seminars for the New Mexico Chiropractic

Association in 2001.  Tr. 274-275 ("It might have been money that was given to me by the State

Chiropractic Association for speaking at the seminars– ").  The evidence shows Johnson knows

how to use a computer.  Tr. 95.  Moreover, Johnson completed reports in his business and

37

submitted several documents to the Appeals council reflecting more than adequate writing and organizational skills.  Notably, the VE testified she reviewed the evidence and was present at the hearing.  The regulations specifically note the appropriateness of VE testimony regarding the transferability of skills.  SSR 82-41, 1982 WL 31389 *4 (1982).

A claimant's skills are most transferable to jobs in which the same or a lesser degree of skill is required; the same or similar tools and machines are used; and the same or similar raw materials, products, processes, **or** services are involved.  20 C.F.R. §§ 404.1568(d)(2), 416.968(d)(2).  However, a complete similarity of all three factors is not necessary.  *Id.* §§404.1568(d)(3), 416.968(d)(3).  In addition, "the skill level of PRW will be apparent simply by comparing job duties with the regulatory definition of skill levels" and "is especially true with . . . most highly skilled work."  SSR 82-41, 1982 WL 31389 *4 (1982).  "A VS (VE) is sometimes required to assist the ALJ in determining the skill level of past work."  *Id.*  In this case, the VE testified that the profession of chiropractor was a skilled position with an SVP (specific vocational preparation) of 8.  Tr. 299.  The jobs the VE identified required a lesser degree of skill.  The Research Assistant II and Teacher's Aide I have SVPs of 6 and the Information Clerk has an SVP of 4.  The VE testified that Johnson was capable of making a vocational adjustment to these jobs.  The Research Assistant II typically "p]repares statistical tabulations using a calculator or computer." and [w]rites reports."  DOT No. 199.267-034.  A Teacher Aide assists teaching staff and "[d]iscusses assigned teaching area with classroom teacher to coordinate instructional efforts and "[p]repares lesson outline and submits it to teacher for review" and "[p]lans, prepares, and develops various teaching aides."  DOT 099.327.010.  An Information Clerk generally "[r]eceives and answers requests for information from company officials and employees."  DOT 237.367.022.

38

The record indicates Johnson possessed specific skills identified by the VE as "basic general office skills."   The VE's testimony constituted substantial evidence upon which the ALJ properly relied.  Accordingly, the ALJ's finding of nondisability is affirmed.

**F.  Conclusion**

The Court's role is to review the record to ensure that the ALJ's decision is supported by substantial evidence and that the law has been properly applied.   It is not this Court's role on appeal from this agency determination to reweigh the evidence or to substitute its judgment for that of the Commissioner.  *See Hargis v. Sullivan*, 945 F.2d 1482, 1486 (10th Cir. 1994).   In light of the narrow scope of the Court's review, the Court is satisfied that substantial evidence supports the ALJ's RFC determination and her finding of nondisability.  Accordingly, the ALJ's decision is affirmed.

A judgment in accordance with this Memorandum Opinion will be entered.

_____

**DON J. SVET**
**UNITED STATES MAGISTRATE JUDGE**